SUGAR CREEK CREAMERY COMPANY v. FOWLER.

4-5000

Opinion delivered March 28, 1938.

*Meeks & Lowenstein* and *Schoonover & Schoonover*, for appellant.

*Eric V. Hoyt* and *Richardson & Richardson*, for appellee.

GRIFFIN SMITH, C. J. Appellant is a foreign corporation with St. Louis as its principal place of business. Ray Smock was the admitted agent of appellant at Doniphan, Missouri. He testified that a creamery station at Supply, in Randolph county, Arkansas, was handled under his supervision, and that he made a contract with Frank McCann whereby McCann bought cream.

The complaint alleges that appellee had given appellant permission to occupy an addition to his store building, and that appellant's agent negligently maintained a defective oil stove, and that fire spread from the stove, destroying the building and stock of merchandise owned by appellee.

Appellant denied that it was doing business in Randolph county, and denied that it had an authorized agent there. Summons was served on Mrs. Elzena McCann, wife of Frank McCann. Motion was filed to quash the service. This motion, following a hearing, was overruled.

Errors assigned are (1) that appellant's motion to quash service should have been sustained, and (2) that no negligence was shown.

Ray Smock testified in part as follows: "I had a buyer at Supply that had ceased buying, and Mr. McCann came up to Doniphan and asked me if he could go there and buy for us, and I told him that he could. He took the equipment the other person had, and had it put in another building. I told him I would give him so much a pound for butter fat delivered at Doniphan. He brought the cream to Doniphan and I paid him a commission. I charged it and shipped it myself to the defendant. I did not, and Sugar Creek Creamery Company did not, have anything to do with the maintenance of the place of business at Supply. I have sub-stations all over the country at country stores and little towns. They have to furnish their own place of business to buy cream. After they brought the cream in we checked it and they got so much a pound for buying it, for which we paid them. I mean

by 'we,' my son and I. I did not mean the Sugar Creek Creamery. I, myself, hired Mr. McCann to buy cream to be delivered at Doniphan. ... The equipment belonged to the Sugar Creek Creamery Company. It had been stationed at Supply before Mr. McCann came there. I had no arrangement of any' kind with Elzena McCann, wife of Frank McCann.''

On cross-examination Smock testified: ''I went over to the sub-station two or three or four times a year unless they would call me about something. If they called us, my son made trips to see that they were cleaned up and in good shape. I admit that I was agent for the Sugar Creek Creamery Company at Doniphan, and authorized to maintain sub-stations and sub-agencies. They had signs put up on these sub-stations that read 'Sugar Creek Creamery Company.' ... I knew that Mrs. McCann bought some cream, but did not know that she was doing all the buying. The checks were signed 'F. D. McCann.' ''

Appellant's business practice, as shown by further testimony of the same witness, was to permit operators of the sub-stations, in buying cream, to draw drafts on the company direct, the form being:

''Sugar Creek Creamery Company, Incorporated. St. Louis, Mo. Patron's Cream Coupon. [Date]. Pay [seller] Thirty-Six Cents. F. B. McCann, Operator, Supply, Ark., Station. To First National Bank, St. Louis, Mo. Not Good for More than Fifteen Dollars.''

Although the drafts were drawn on St. Louis, Smock testified that, generally, they were cashed by stores in the neighborhood of the sub-stations and then forwarded to him at Doniphan. He said: ''These cream checks are always small and the bank charges for cashing them, so I made arrangements with the merchants to cash them at full value, and they gather them up and send them to me. I stamp them 'paid' and send them to St. Louis.''

Frank McCann testified that his agreement with Smock was made in 1935; that he had been in the building at Supply a little over a year when it burned; that for a while he worked at Pocahontas; that while so employed he took his wife to Supply every Friday night so she could buy cream on Saturday, but that Smock had

nothing to do with this arrangement. He (McCann) did not know whether Smock knew how the business was being handled. Mrs. McCann wrote the checks and signed them ''F. B. McCann.'' ''[Mrs. McCann] signed my name to the checks [drafts] when I wasn't there. I suppose [Smock] knew she was buying when I wasn't there. It had been some time since I bought cream before the fire. She had been attending to it altogether and had been making out reports to the company. Doniphan is fifteen or sixteen miles from Supply.''

Mrs. McCann testified that she did not have a contract with Smock or with appellant to handle the business at Supply, but ''I did take care of it a good part of the time. . . . I bought in my husband's place when he was gone. I ran the station all the time since 1936 and am running it now like I did then. . . . I would estimate that I saw Mr. Smock five or six times after the spring of 1936 at his cream station in Doniphan. . . . Sometimes he would ask me how I was getting along and I told him all right. When we first began buying, the stove leaked and he sent one down in the place of that one. The new one did not leak. My husband taught me to buy cream in 1935 when we had a station at Pratt, Missouri. I bought some cream at Pratt for the Sugar Creek Creamery Company. . . . The summons in this case was served on me. I was at the cream station and buying cream the same as I had been before. My husband was not there and was not accustomed to being there at that time. When he bought he wrote the checks, and when I bought I wrote them.''

Appellee testified that on the evening of August 10, 1936, he was in Smock's place of business at Doniphan and talked about the station, and about Mrs. McCann operating it. ''They were not getting the business they had been getting there, and he asked me why. I told him that they were away from there and lived at Pocahontas, and a lot of times it was late when they got there, and Mrs. McCann would leave on the chicken truck about the middle of the afternoon. He stated that he tried to teach Mrs. McCann how to operate. He said she didn't seem to know how to test cream. . . . He did know that she was

874

buying cream and issuing checks and that Mr. McCann had stopped and was working at Pocahontas.

"I instructed my wife to write to Mr. Smock about the way Mrs. McCann was conducting the business there, and to ask that I have possession of the building. She wrote Mr. Smock two letters and did not get an answer to either one from Mr. Smock."

Witness then read from a letter received from appellant, dated in St. Louis October 30, 1936, as follows: "Dear Mrs. Fowler: Your letter to Mr. Smock was forwarded on to us and I will say that I am asking Mr. Smock to call on you in the very near future and see if he cannot get something straightened out to your entire satisfaction, as ours. If Mr. Smock doesn't call on you within the next week, please write me direct, using the enclosed stamped envelope, and I will make other arrangements to see that you are paid a visit in the very near future." The letter was signed by J. A. Epler as superintendent of appellant's cream department.

Continuing his testimony, appellee said that Smock made a trip "there" the next week, but did not stop to see appellee. "I then instructed my wife to write Sugar Creek Creamery Company direct about Mrs. McCann and the occupancy of the building, and received the following letter: 'Our representative, Mr. Short, will be out to Supply Tuesday or Wednesday of next week. He will be glad to make some kind of arrangement at that time.' " This letter was dated November 19, 1936. Mr. Smock, appellee said, was at Supply during the time Mrs. McCann was buying cream. These visits were not frequent. Appellee stated that he saw the letters his wife wrote, but a copy of one of them was destroyed by the fire. "The first one was about changing the outfit and getting possession of the building. There was something said in one of the letters about the way the station was being operated. We told them they should come and look it over and see what was going on. I wanted possession of the building. I am not sure what was said about any particular person operating it. I made a trip to see Mr. Smock and told him about how Mrs. McCann was running the station."

On the question of damages appellee testified that the store building was erected in 1933 of first-class lumber, with new metal roof, concrete foundation, etc.; that there was a side-room attached to the main building on the north side, about fifteen or eighteen feet long and ten feet wide. Appellee said: "Frank McCann came to me and told me they had to move in from where they were—that the place had been condemned—and he came to me to know if he could use my building. I told him he could, provided it met with specifications, and they could use it as long as everything was going on right and he looked after things. This was in June, 1935. They occupied the place for seventeen or eighteen months. I did not have any discussion with them until I tried to get. them out. The first talk I had [on this subject] was August 10, 1936. I talked with Ray Smock. . . . Equipment used in the side-room was some kind of a tank for hot water, and an oil stove—a two-burner oil stove—and test tubes, and then an outfit to turn to make the tests with. This was the equipment that belonged to the Sugar Creek Creamery Company. The oil stove was leaky, with oil spots on the floor. The wall was papered with blue paper and oil was soaked up on this paper. I saw these conditions two or three weeks before the fire. There was a small cup of oil at one end of the pipe that fed the burners. When I saw it this cup was two-thirds full of oil. The stove was set right up against the wall and the wall was soaked with oil. If any repairs were made on the stove [subsequent to the time witness saw it] I do not know of them, and there was no change in the location of the stove.

"On the morning of November 21, 1936, Mrs. McCann unlocked the room and went in. I don't know what she did, but she was in the habit of lighting the stove and then going to her mother's while it got hot. The stove was lighted to heat water for making the tests of cream. [That morning] she was in there only about four or five minutes. She then closed the door and went to her mother's, about 140 or 150 yards away. In about fifteen or twenty minutes—might not have been that long—Joe Redwine, who was coming down the hill in a wagon, hol-

lered 'fire.' I ran out there and when I got to the front door of my place I saw the fire and knew it wasn't any use doing anything because it was too far gone, so I went back to get my account books. Mrs. McCann never did come back.''

Evidence tending to show that Mrs. McCann had continued to operate the station in her husband's place, with full knowledge and acquiescence of Smock, is substantial. The court properly overruled the motion to quash service.

■ Smock was appellant's general agent and his authority extended to all matters connected with the procurement of cream. It is not denied that appellant's machinery was installed in appellee's building, and Mrs. McCann, with the knowledge and implied approval of Smock, used the equipment in testing cream which was bought for appellant. When the commodity was purchased payment was made by draft drawn on appellant—that is, appellant's money was used in paying customer accounts. The draft form supplied F. B. McCann recognized him as operator of the station. Any disinterested person reading the record would be justified in believing that Smock had accepted Mrs. McCann's services in substitution of the services of F. B. McCann, or in cooperation with him, and therefore such evidence is substantial. Appellant's situation is that of one to whom misfortune has come from an unexpected source and cause, yet nevertheless the proximate cause of appellee's loss was the instrumentality which appellant placed in Mrs. McCann's hands— an instrumentality which Mrs. McCann used in a negligent manner.

The judgment, being for $1,500, is affirmed.